IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | 1:16-cr-43 (LMB) |
| RICHA NARANG, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

After a bench trial of Richa Narang ("Narang" or "defendant") on one count of conspiracy to commit visa fraud and two counts of visa fraud, the Court took the case, as well as defendant's motion to dismiss the indictment for insufficient evidence, under advisement. This Memorandum Opinion constitutes the Court's findings of fact and conclusions of law. For the reasons stated below, defendant's motion to dismiss will be denied, and she will be found guilty of all three charges.

## I. BACKGROUND

This case had a difficult procedural history, which resulted in a significant delay in its resolution.

### A. Original Indictment and Proceedings

On April 26, 2016, a federal grand jury in the Eastern District of Virginia returned a 21-count indictment charging Narang and five codefendants—Raju Kosuri ("Kosuri"), Smriti Jharia ("S. Jharia"), Vikrant Jharia ("V. Jharia"), Sanchita Bhattacharya ("Bhattacharya"), and Raimondo Piluso ("Piluso")—with various offenses related to an alleged H-1B visa fraud scheme. Specifically, Narang was charged with one count of conspiracy to commit visa fraud in

violation of 18 U.S.C. § 371 (Count 1)[1] and two counts of visa fraud in violation of 18 U.S.C.

§ 1546(a) (Counts 6 and 7).[2] At the arraignment, Narang and her codefendants entered not guilty

pleas to all charges and requested trial by jury.

Narang subsequently reached a plea agreement under which she agreed to plead guilty to

a one-count criminal information charging her with wire fraud[3] and to cooperate fully with the

prosecution. In exchange, the government agreed to move to dismiss Counts 1, 6, and 7 of the

indictment pending against Narang and agreed not to prosecute her further for any offenses

related to the alleged visa fraud scheme. On August 18, 2016, after conducting a plea colloquy

---

[1] Section 371 makes it a crime for "two or more persons [to] conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof[,] in any manner or for any purpose," so long as any of the conspirators "do[es] any act to effect the object of the conspiracy." 18 U.S.C. § 371. If the object of the conspiracy is a felony offense, § 371 exposes a defendant to up to five years' imprisonment. See id.

[2] Section 1546 prohibits various forms of fraud in the visa context. For example, § 1546(a) applies to any individual (i) who "knowingly forges, counterfeits, alters, or falsely makes any immigrant or nonimmigrant visa, permit, border crossing card, alien registration receipt card, or other document prescribed by statute or regulation for entry into or as evidence of authorized *stay or employment* in the United States"; (ii) who, "when applying for an immigrant or nonimmigrant visa, permit, or other document required for entry into the United States, or for admission to the United States[,] personates another . . . or evades or attempts to evade the immigration laws by appearing under an assumed or fictitious name without disclosing his true identity"; or (iii) who "knowingly makes under oath, or as permitted under penalty of perjury . . . knowingly subscribes as true, any false statement with respect to a material fact in any application, affidavit, or other document required by the immigration laws or regulations prescribed thereunder, or knowingly presents any such application, affidavit, or other document which contains any such false statement or which fails to contain any reasonable basis in law or fact." 18 U.S.C. § 1546(a). A first-time conviction under § 1546(a), at least where the fraud was not intended to facilitate international terrorism or drug trafficking, exposes a defendant to a maximum of 10 years' imprisonment. See id.

[3] See 18 U.S.C. § 1343 ("Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both.").

under Rule 11 of the Federal Rules of Criminal Procedure, the Court accepted Narang's guilty plea, found her guilty of wire fraud, and dismissed the indictment against her. Narang's codefendants Kosuri, S. Jharia, and Piluso also reached plea agreements with the government.[4]

On September 22, 2016, a federal grand jury returned a superseding nine-count indictment charging the remaining defendants, Bhattacharya and V. Jharia, with various offenses related to the alleged H-1B fraud scheme, and the original indictment was dismissed. Bhattacharya and V. Jharia went to trial later that year. On the third day of trial—after Narang had been called as a government witness the previous day—counsel for Bhattacharya and V. Jharia advised the Court of potential violations of the government's obligations under Brady v. Maryland, 373 U.S. 83 (1963), Giglio v. United States, 405 U.S. 150 (1972), and the Jencks Act, Pub. L. No. 85-269, 71 Stat. 595 (1957) (codified as amended at 18 U.S.C. § 3500). For example, the defendants identified undisclosed prosecutorial notes from interviews conducted with government witnesses, including Narang, that they claimed contained material impeachment evidence. See, e.g., Jury Trial Tr. [Dkt. No. 160] 504-06. The defendants also complained that the prosecution had turned over hundreds of pages of investigative reports at midnight before the third day of trial. See id. at 512-13. In addition, the defendants raised concerns about whether the government had timely disclosed an offer of immunity to a witness and whether the government had produced all witness statements pursuant to the Jencks Act. See, e.g., id. at 504-05, 516, 522.

---

[4] Kosuri pleaded guilty to conspiracy to commit visa fraud (Count 1 of the indictment), visa fraud (Count 2), and making a false statement to the Small Business Administration (Count 17); S. Jharia pleaded guilty to unlawful procurement of citizenship or naturalization (Count 20); and Piluso pleaded guilty to making a false statement to the Small Business Administration (Count 19). All other charges pending against those defendants were dismissed.

Based on these alleged discovery abuses, Bhattacharya and V. Jharia jointly moved to dismiss the superseding indictment with prejudice. Jury Trial Tr. [Dkt. No. 160] 511. In response, the chief of the criminal division of the U.S. Attorney's Office for the Eastern District of Virginia, speaking on behalf of the government, acknowledged that he "c[ould] not say . . . with any confidence that [the government had] met [its] discovery obligations" but urged the court to declare a mistrial so that the defendants could be retried. Id. at 542. The Court concluded that the government had violated its discovery obligations and dismissed the superseding indictment against Bhattacharya and V. Jharia with prejudice. The government did not appeal that order of dismissal.

**B.  Withdrawal of the Previous Guilty Pleas**

One week after dismissing the superseding indictment, the Court granted the four remaining codefendants' motions to continue their sentencing hearings to enable them to engage in additional discovery with the government and "evaluate the impact, if any, of the problems . . . which led to the dismissal of the charges against" Bhattacharya and V. Jharia. Order [Dkt. No. 166] 1. The Court advised each remaining defendant to consider whether to proceed to sentencing or move to withdraw his or her guilty plea. Status Conf. Tr. [Dkt. No. 291] 16. The Court further advised the defendants that if they elected to withdraw their guilty pleas, any future proceedings could be "randomly reassigned to a different judge for trial" if they wished. See id. at 16-17.

Piluso was the first to move to withdraw his guilty plea. The government not only consented to the withdrawal of the plea but also, after having reviewed the evidence concerning Piluso's role in the alleged fraud scheme, moved to dismiss the indictment against him. The Court granted Piluso's motion to withdraw his guilty plea and the government's motion to dismiss the indictment.

Narang, Kosuri, and S. Jharia also moved to withdraw their guilty pleas and to dismiss their respective charging documents, motions which the government opposed. The Court concluded that despite the heavy presumption of veracity afforded to statements made during plea colloquies, the fairest procedure in light of what had happened was to permit the defendants to withdraw their guilty pleas, at which point each could proceed to trial or negotiate a new plea agreement with the government. See Mots. Hr'g Tr. [Dkt. No. 251] 11-12. The Court also reiterated that each defendant could elect to have future proceedings reassigned to a different district judge. Id. at 12-13.

S. Jharia and Kosuri elected to negotiate new plea agreements with the government. See Status Conf. Tr. [Dkt. No. 266] 3. Both declined to have their cases reassigned to a new judge, and the Court accepted both defendants' new guilty pleas.[5] On December 22, 2017, Kosuri was sentenced to 28 months' imprisonment to be followed by three years' supervised release, and S. Jharia was sentenced to one year of supervised probation.

### C. Narang's Not Guilty Plea and Bench Trial

Unlike S. Jharia and Kosuri, Narang elected to enter a plea of not guilty and proceed to trial. When asked whether "th[e] case need[ed] to be reassigned to another judge," counsel for Narang responded that she "would prefer that [the same judge] keep the case." Status Conf. Tr. [Dkt. No. 266] 11-12. Rather than requiring the government to secure a new grand jury indictment, the Court reinstated the original indictment that had charged Narang with one count of conspiracy to commit visa fraud and two counts of visa fraud. Narang also elected to waive

---

[5] Both defendants ultimately pleaded guilty to the same offenses for which they had previously admitted guilt: S. Jharia to unlawful procurement of citizenship or naturalization (Count 20 of the original indictment) and Kosuri to conspiracy to commit visa fraud (Count 1), visa fraud (Count 2), and making a false statement to the Small Business Administration (Count 17).

her right to trial by jury and requested a bench trial, and both parties submitted proposed findings of fact and conclusions of law for the Court's consideration.[6]

The Court conducted a one-day bench trial during which the government called six witnesses: Kosuri, Narang's codefendant; Ravinder Kaur ("Kaur"), an unindicted coconspirator who testified under an immunity agreement; Divya Chopra ("Chopra"), on whose behalf Narang and her coconspirators attempted to obtain an H-1B visa; Ramesh Venkata ("Venkata"), whose wife was another H-1B visa beneficiary working with Narang and her coconspirators; and Michael Violett ("Violett") and Laura Hutson ("Hutson"), two U.S. Citizenship and Immigration Services ("USCIS") officers.[7] Narang called only one witness: Rajiv S. Khanna ("Khanna"), who had previously been qualified as an expert on employment immigration law.

After the conclusion of the evidence and closing arguments, Narang moved to dismiss the indictment for insufficient evidence[8] and has twice supplemented that motion.[9]

---

[6] Although Narang's proposed findings and conclusions were simply pro forma statements that the government "has failed to meet its burden of proving every element of the crime charged beyond a reasonable doubt," see Proposed Findings of Fact & Conclusions of Law [Dkt. No. 309], the government's proposed findings and conclusions were more detailed.

[7] The government offered Violett, a longtime USCIS officer with substantial experience, as an expert on the H-1B visa program. Defendant did not object, and the Court found him qualified to offer expert testimony. Hutson, also a longtime USCIS officer, did not testify as an expert witness, but rather as the USCIS officer who carried out the investigation of the visa fraud conspiracy at issue here.

[8] Defendant's motion for dismissal of the indictment was brought under Rule 29 of the Federal Rules of Criminal Procedure, which establishes the applicable procedures for a motion for judgment of acquittal both before and after a case is submitted to a jury. As several courts of appeals have observed, "a plea of not guilty in a trial to the bench is the functional equivalent of a motion for acquittal in a jury trial" because the judge in a bench trial "implicitly rules on the sufficiency of the evidence by rendering a verdict of guilty." See, e.g., United States v. Atkinson, 990 F.2d 501, 503 (9th Cir. 1993). Accordingly, Narang's "motion to acquit is superfluous," id., and is necessarily denied in light of the Court's finding that she is guilty on all three charges.

[9] The first of Narang's supplemental filings, a two-page document styled as an "Addendum" to her motion to dismiss the indictment, points to Sessions v. Dimaya, 138 S. Ct. 1204 (2018), in which the Supreme Court held that the residual clause definition of "crime of violence" in

## II. FACTUAL FINDINGS[10]

The evidence at trial revealed that Kosuri created and operated a wide-reaching and complex visa fraud scheme. The evidence further revealed that Narang willingly joined and played a major role in that scheme, including through her knowing and intentional production of fraudulent documents that would be submitted to the USCIS and that would be material to that agency's evaluation of the H-1B visa applications.

### A. The H-1B Visa Program

The H-1B visa program allows U.S. businesses to employ foreign skilled workers on a temporary basis to fill specified needs. An H-1B visa is typically valid for only six years, and upon its expiration the visa recipient (known in immigration-law parlance as the "beneficiary") must pursue lawful immigration status through other avenues or return to his or her country of

---

18 U.S.C. § 16(b) is unconstitutionally vague. The Addendum's argument amounts to just one line: "No less unenforceable for vagueness are the statutory and regulatory 'requirements' of the H1-B visa process as touted by the Government in its pursuit of [Narang]." Addendum to Mot. to Dismiss Indictment [Dkt. No. 351] 2. This assertion amounts to a reiteration of Narang's arguments that the immigration laws and regulations are simply too complex or unclear to support a finding of visa fraud in this case. As elaborated below, those arguments are meritless.

Narang's "Second Addendum" argues that the delay between the date of the bench trial and the issuance of a decision violates her Sixth Amendment right to a speedy trial. Second Addendum to Mot. to Dismiss Indictment [Dkt. No. 355] 1, 3. The speedy trial right chiefly exists "to assure that cases are brought to trial" in a timely fashion. Barker v. Wingo, 407 U.S. 514, 529 (1982); see also Smith v. Hooey, 393 U.S. 374, 377-78 (1969) (observing that the speedy right serves to "prevent undue and oppressive incarceration prior to trial" and to "limit the possibilities that long delay will impair the ability of an accused to defend himself"). There is no dispute that Narang's bench trial was conducted in a timely fashion. Although a delay between a bench trial and the resulting judgment implicates a defendant's speedy trial right, the Court does not find that the delay in Narang's case was so extensive or unjustified as to merit dismissal of the indictment. Moreover, Narang has been on bond throughout these proceedings and therefore has not been subjected to any "oppressive incarceration" either before or after trial.

[10] References in the form "GEX ___" are to the government's exhibits and "DEX ___" to defendant's exhibits. Unless otherwise stated, all pincite references to the government's exhibits are to the Bates numbering.

origin. To be eligible for an H-1B visa, the beneficiary must have at least a bachelor's degree (or the equivalent) or "[h]ave education, specialized training, and/or progressively responsible experience that is equivalent to completion of a United States baccalaureate or higher degree in the specialty occupation." See 8 C.F.R. § 214.2(h)(4)(iii)(C) (2015) (listing beneficiary qualifications).[11] Because the number of H-1B visas available each year is limited and usually exceeded by the number of H-1B petitions filed, the government uses a lottery system to decide which petitions it will adjudicate. H-1B petitions not selected in the lottery are automatically rejected.

A U.S. employer seeking to take advantage of the H-1B program must first file a labor condition application ("LCA") with the U.S. Department of Labor (the "DOL"). See generally GEX 3 (graphical overview of the H-1B visa application process). Each LCA must include, among other things, "a specification of the number of workers sought, the occupational classification in which the workers will be employed, and wage rate and conditions under which they will be employed." 8 U.S.C. § 1182(n)(1)(D); see also GEX 1 (outlining the requirements for completing an LCA, including identification of the geographical area of employment and prevailing wage information). An employer may file one LCA seeking DOL approval for multiple positions. An employer submitting an LCA is required to be truthful, and any willful misrepresentation of material fact exposes the employer to administrative remedies, civil fines, and other penalties. See, e.g., id. § 1182(n)(2)(C).

Once the DOL has approved an LCA, the employer must file a Form I-129 petition with the U.S. Department of Homeland Security ("DHS") for each foreign skilled worker it seeks to

---

[11] All references to the Code of Federal Regulations (C.F.R.) or the United States Code (U.S.C.) in this subsection are to the 2015 versions.

hire for a position identified in the LCA. See generally GEX 2 (providing instructions for completing I-129 petitions).[12] Although a company may file a I-129 petition on its own behalf, a third-party staffing company also may act as an intermediary between the underlying "client site"—that is, the employer for whom the beneficiary will work—and the government. The I-129 petitioner must demonstrate to the government that the position to be filled by the designated foreign worker is a "specialty occupation position," which is defined as one for which a bachelor's degree or its equivalent is normally required or for which "[t]he nature of the specific duties are so specialized and complex that [the] knowledge required to perform the duties is usually associated with the attainment" of such a degree. See 8 C.F.R. § 214.2(h)(4)(iii)(A).[13] The petition must also specify many details about the position to be filled, including the job duties, expected hours, and length of employment. As with all submissions seeking immigration-related benefits, the petitioner "must sign . . . [the] request" and "certif[y] under penalty of perjury that the . . . request, and all evidence submitted with it, either at the time of filing or thereafter, is true and correct." Id. § 103.2(a)(2) (included as GEX 90A).

Each I-129 petition is assigned to a USCIS adjudications officer. If the petition is deficient or unclear, the officer can seek additional information from the petitioner through a request for evidence ("RFE"). RFEs may cover information about anything from the specific job

---

[12] Although defendant objected that this version of the instructions expired in October 2013, the Court overruled that objection after Violett explained that no substantive changes had occurred between the older and newer versions. See Bench Trial Tr. [Dkt. No. 358] 26-27.

[13] See also 8 C.F.R. § 214.2(h)(4)(ii) ("Specialty occupation means an occupation which requires theoretical and practical application of a body of highly specialized knowledge in fields of human endeavor including, but not limited to, architecture, engineering, mathematics, physical sciences, social sciences, medicine and health, education, business specialties, accounting, law, theology, and the arts, and which requires the attainment of a bachelor's degree or higher in a specific specialty, or its equivalent, as a minimum for entry into the occupation in the United States.").

duties or industry to the exact relationship between a staffing company and the underlying employer. See Bench Trial Tr. [Dkt. No. 358] ("Bench Trial Tr.") 25. If after further review a petition is found to be incurably deficient or fraudulent, the USCIS will deny the petition. See id. at 32-33.

If the DHS approves an I-129 petition and authorizes the issuance of an H-1B visa to the foreign worker,[14] the petitioner must inform the worker and begin paying the worker's salary promptly. See 20 C.F.R. § 655.731(c)(6) (included as GEX 90). Normally, an H-1B beneficiary "shall receive the required pay beginning on the date when [he] 'enters into employment,'" meaning the day when he "first makes [him]self available for work or otherwise comes under the control of the employer." Id. If a beneficiary has not made himself available for work, payment must begin 30 days after the date he is first admitted into the United States or, if already present in the country, within 60 days of becoming eligible to work. Id. If the beneficiary is available for employment and in the United States but the position is not immediately available, the employer has an obligation to pay the beneficiary for nonproductive time. Finally, if during the course of a beneficiary's visa term the underlying conditions of employment change—for example, if the employer no longer needs the foreign skilled worker's services—the employer must notify the USCIS, and the beneficiary's H-1B status will be terminated.

## B. EcomNets and the Fraud Scheme

Kosuri incorporated EcomNets Inc. ("EcomNets") in 2000. GEX 4. Initially, the company was focused on software development; however, around 2011, its focus shifted to obtaining work visas for IT professionals. Most of the individuals for whom Kosuri attempted to

---

[14] Although the USCIS must approve the issuance of an H-1B visa, it is the U.S. Department of State, and not the DHS, that ultimately issues nonimmigrant visas.

procure visas were Indian nationals, many of whom were already living in the United States under dependent visas but were not permitted to work. EcomNets's main offices, at which no more than 10 employees worked, were located in Loudoun County, Virginia. Some time in 2010 or 2011, Kosuri opened an additional facility in Danville, Virginia, which came to be known as the "Green Technology Center." The Danville facility was essentially a warehouse, containing a few computers used for customer data storage. There were never more than three employees working in that facility: two office managers and one technician.

To prevent USCIS from becoming suspicious about his scheme, Kosuri created a number of other companies to be used as the petitioners on H-1B visa applications. These companies were Unified Systems USA Incorporated ("Unified Systems"), see GEX 5; United Tech Inc. ("United Tech"), see GEX 6; United Software Solutions Incorporation ("United Software"), see GEX 7; and Data Systems Inc. ("Data Systems"), see GEX 8. As part of his scheme, Kosuri called these corporate entities "staffing companies" and listed them as such on multiple H-1B applications. The staffing companies' I-129 petitions would claim to be seeking to fill open positions with EcomNets at its Danville facility.

In fact, none of the four "staffing" companies "operated independently" of EcomNets, nor did any have a separate "physical location, staff, [or] business plan." See Bench Trial Tr. 57; id. at 58 (Kosuri acknowledging that the other companies were "all part of EcomNets"). The evidence also clearly established that the Danville facility had no open positions, no need for additional workers, and no work in software development or any other specialized field. See Bench Trial Tr. 58 (Kosuri direct examination: "Q. Were there, in fact, at any time jobs planned for these people at the Danville facility? A. No, there were no jobs there."). Instead, once one of Kosuri's "staffing" companies had secured an H-1B visa, Kosuri and his coconspirators worked

to find a job for that beneficiary with third-party companies, many of which were located outside Virginia. Those third-party companies paid EcomNets for the services provided by the visa beneficiaries. In turn, EcomNets retained a portion of that payment and funneled the remainder to the beneficiaries. In essence, Kosuri's scheme was to use the ruse of employment opportunities at the Danville facility to obtain H-1B visas and, once the visas were obtained, to place the visa beneficiaries in undisclosed jobs with unrelated third-party employers, keeping a portion of their salaries for EcomNets's expenses and profit.

Kosuri and his coconspirators went to great lengths to shield their actions from governmental scrutiny, including by using fake names and fraudulent documents. For example, I-129 petitions and other documents submitted by United Software were signed by a "Sam Bose," allegedly United Software's HR Manager. Kosuri testified that no such person existed and that the name had been made up by Bhattacharya, who would affix a "Sam Bose" signature to United Software documents when prompted by one of her coconspirators. Bench Trial Tr. 60-61. Petitions and other documents submitted by United Tech were signed by a "Sonia Basu," described as United Tech's HR Manager. This was another fictional name Bhattacharya and other coconspirators used to sign documents submitted to the USCIS. On occasion, even visa beneficiary signatures were forged on documents submitted to the government. See id. at 204 (discussing GEX 75, at 22656, which contains a forged signature for beneficiary Chopra). Compare, e.g., GEX 110, at 2019 (showing a signature for Guatami Sundaram ("Sundaram"), one of the visa beneficiaries working with EcomNets), and Bench Trial Tr. 222 (Venkata, Sundaram's husband, affirming that the signature was hers), with, e.g., GEX 110, at 2036 (showing a markedly different signature), and Bench Trial Tr. 223 (Venkata testifying that the signature was not Sundaram's). Once an H-1B visa had been obtained, Kaur, an unindicted

coconspirator who worked for Kosuri as an HR employee, would cover the fraud by generating "offer letters" detailing the beneficiary's employer, location, job title, and salary—even when no genuine job had been located. The beneficiary would be required to sign the offer letter regardless of its inaccurate contents. See Bench Trial Tr. 70 (Kosuri direct examination: "Q. Why did you want them to sign offer letters when they got their visas approved? A. Because we need to . . . complete the paperwork to keep them employed. You know, they need to have some kind of a job. Q. This is before they even have a job sometimes, right? A. Yes."). To avoid the obligation of paying its visa beneficiaries in a timely fashion, EcomNets instructed the beneficiaries to file false requests for voluntary leave. Id. at 76-77 (Kosuri: "[O]ur intention is not to . . . pay them from the Day One. After they get the project, we want to pay them . . . from their salary from that point onwards."); see id. at 78 (Kosuri recognizing that EcomNets's voluntary leave letter policy was inconsistent with the applicable regulations); see also, e.g., GEX 14A (four-month voluntary leave request signed by Deepika Jaiswal). Kosuri and his coconspirators also forged documents that could be used to mislead government adjudicators in response to RFEs. These included false leases, contract documents, and purchase orders designed to convince USCIS officials that there was a bona fide business relationship between the "shell" company that had acted as the I-129 petitioner and EcomNets. See, e.g., id. at 116-18 (discussing GEX 130, a falsified document indicating that United Software had leased office premises in Sterling, Virginia); GEX 110, at 2082 (containing a false purchase order signed by representatives of EcomNets and United Tech).

### C. Narang's Role

Kosuri hired Narang as EcomNets's Senior Business Development Manager (at times just called the IT Director) in mid- to late 2013. See GEX 11. Her job was to place "bench" beneficiaries—a term used to describe foreign workers who had been issued H-1B visas but who

13

had yet to begin work—with other companies. See GEX 12, at 228135 (Kosuri stating in an

August 2013 email that Narang would be "[r]esponsible for closing all our bench in [the] next

6 months"). Narang was an attractive candidate in part because she represented on her resume

that she had experience with the H-1B visa process. See GEX 9, at 938709. Although Narang

had worked as a senior paralegal and case manager for Khanna's immigration firm since 1999,

her resume misrepresented both her experience with H-1B visa applications and her role as a

supervisor.[15] Once Narang accepted the position, she became the point person for many

beneficiaries' questions about the H-1B visa process. See Bench Trial Tr. 156.

The testimony of witnesses and the documentary evidence established beyond a

reasonable doubt that Narang was intimately involved in all aspects of the H-1B scheme. Cf.

GEX 17 (email from Narang to Kosuri with an attachment outlining the entire recruitment life

cycle). She helped to maintain the "bench" list of all H-1B beneficiaries still looking for jobs.

She worked alongside EcomNets HR staff in preparing the documentation necessary for LCAs,

I-129 petitions, and responses to RFEs. And she was ultimately responsible for obtaining jobs

for approved H-1B beneficiaries looking for work in locations other than the Danville, Virginia

facility, including as far as California. See, e.g., GEX 23 (referring to a beneficiary whose

"relocation preference" was Burbank, California (capitalization altered)); see also GEX 25A

(containing a list of "bench" beneficiaries awaiting a job and listing their locations, including

Arizona, Connecticut, Illinois, Iowa, New Jersey, New York, North Carolina, and Texas).[16] If

---

[15] See Bench Trial Tr. 280-82 (Khanna explaining that Narang was not involved with H-1B visa applications and did not have a supervisory role in his law firm).

[16] Narang's efforts were not always successful. See, e.g., Bench Trial Tr. 194 (Chopra describing how after her H-1B visa was issued, Narang had difficulty locating a position for her and even instructed her to "look for a project [her]self"); see also id. at 220 (Venkata stating that after Guatami Sundaram's H-1B visa was approved it was difficult to contact Narang and that she did not promptly find Sundaram a job). To make matters more difficult, Narang would reject

beneficiaries were having trouble finding jobs, Narang would prompt them to lie to make themselves more attractive, as for example when she sent a beneficiary sample resumes and instructed the beneficiary to "fill in" a gap in work experience. See Bench Trial Tr. 195.

Narang also played a major role in preparing key documents needed to carry out Kosuri's scheme. For example, she directed the process by which beneficiaries who had not yet received jobs filed requests for voluntary leave so that EcomNets could avoid paying them while job searches were underway. See, e.g., GEX 14 (email from Narang to two EcomNets human resources employees related to the voluntary leave letters); see also GEX 31 (showing 13 beneficiaries whose petitions were filed by United Software who were on voluntary leave as of May 1, 2014). Compare, e.g., GEX 27 (requesting offer letters for four consultants to be employed by United Software), with, e.g., GEX 28 (requesting voluntary leave letters for the same four consultants). On at least one occasion, Narang went to great lengths to pressure a beneficiary into signing a voluntary leave letter, demanding that the beneficiary travel over 10 hours to Virginia for a next-day meeting after she refused to sign. See Bench Trial Tr. 197-99. Narang also ordered other staff to prepare "offer letters" for beneficiaries that she understood would be signed on behalf of United Software by "Sam Bose," which was commonly known to be a fake name among EcomNets employees. See id. at 80-81. Indeed, Narang herself confirmed the common awareness that "Sam Bose" was a fictional identity when she sent Kosuri an email attaching documents with blank signatures for Sam Bose as HR Manager for United Software and told Kosuri that they needed to "get the last page . . . signed from [Bhattacharya]." GEX 18, at 949354, 949361; see also GEX 51 & 51A (Narang's email instructing Bhattacharya

---

possible positions if "the rates [were] not matching"—that is, if the prospective position's salary was too low, at least relative to the expected wages stated in the visa application materials, for EcomNets to recover its expenses and earn a profit. Id. at 194-95.

to "[p]lease do the needful" with respect to a document that had to be signed by Sam Bose). Narang directed Bhattacharya to prepare "offer letters" for beneficiaries and specified the exact salary that should be included in each letter, even if no actual employment had yet been obtained for those beneficiaries, and Bhattacharya responded with letters on United Software letterhead signed by "Sam Bose." See, e.g., GEX 15; GEX 26. Narang also instructed her staff about specific legally relevant language to include in the documents they were preparing for use in H-1B visa applications, as for instance when she told Bhattacharya to include "right to control language" in offer letters for four visa recipients. See, e.g., GEX 34. Further, Narang made sure all relevant EcomNets employees were keeping careful track of the information used for each of Kosuri's distinct corporate entities, warning the employees not to "interchange any information[, e]specially the names of the signing authorities, addresses and [federal employer identification numbers]." GEX 21, at 232449. Finally, Narang helped to prepare key documents used to persuade government officials to authorize the H-1B visa applications, including letters falsely claiming that EcomNets was operating a large-scale data and cloud computing center in the Danville, Virginia warehouse. See, e.g., GEX 48; see also GEX 50; GEX 101, at 230, 262-63 (showing Narang's signatures on immigration forms submitted in response to RFEs containing false information, including a falsified lease and a nonexistent "Enterprise Cloud Implementation" project); GEX 75, at 22683-84 (showing Narang's signature on an EcomNets letter describing an alleged contract for "Enterprise Cloud Implementation" at the Danville site).

Narang was not only intimately involved with every aspect of Kosuri's H-1B scheme; she also received a substantial financial benefit from that involvement. In addition to her $70,000 base salary, see GEX 11, at 1609, she received commissions based on the total number of hours worked by the visa beneficiaries whom she helped to find jobs, Bench Trial Tr. 110. See, e.g.,

GEX 40 (email from Narang reporting over 5000 hours for which she was entitled to a commission over a four-month period); GEX 41 (email from Narang reporting over 9000 hours for which she was entitled to a commission over a three-month period).

During Narang's tenure with EcomNets, Kosuri's scheme produced a substantial number of H-1B visa applications. In fiscal years 2014 and 2015, 121 petitions submitted by Kosuri's four "staffing" companies were selected for adjudication in the H-1B lottery, see GEX 91A—a total which does not include the petitions submitted but not selected in the lottery or any amendments to existing petitions, see Bench Trial Tr. 226-27. Narang's signature appears on over 170 documents associated with these H-1B petitions filed with USCIS over that period. See GEX 92; see also GEX 93A-93C (providing additional details about those petitions).

### III. ANALYSIS

The original indictment in this case, which was reinstated before Narang's bench trial, charged her with one count of conspiracy to commit visa fraud and two counts of visa fraud.

#### A. **Conspiracy to Commit Visa Fraud**

Count 1 of the indictment alleges that Narang conspired, along with Kosuri, S. Jharia, V. Jharia, and Bhattacharya, to use fraudulent representations to obtain H-1B visas for their beneficiary clients. "To prove a conspiracy under 18 U.S.C. § 371, the government must establish an agreement to commit an offense, willing participation by the defendant, and an overt act in furtherance of the conspiracy." United States v. Tucker, 376 F.3d 236, 238 (4th Cir. 2004).

##### 1. Agreement to Commit an Offense

"[T]he fundamental characteristic of a conspiracy is a joint commitment to an 'endeavor which, if completed, would satisfy all of the elements of [the underlying substantive] criminal offense.'" Ocasio v. United States, 136 S. Ct. 1423, 1429 (2016) (alteration in original) (quoting Salinas v. United States, 522 U.S. 52, 65 (1997)). "The existence of a 'tacit or mutual

understanding' between conspirators is sufficient evidence of a conspiratorial agreement,"
United States v. Ellis, 121 F.3d 908, 922 (4th Cir. 1997) (quoting United States v. Burgos,
94 F.3d 849, 862 (4th Cir. 1996) (en banc)), and "[k]nowledge and participation in the
conspiracy may be proven by circumstantial evidence," Tucker, 376 F.3d at 238.

The government proved the existence of a conspiracy among Kosuri and his associates,
including Narang, beyond a reasonable doubt. Unequivocal evidence at trial showed that
EcomNets's employees engaged in sustained efforts to prepare false LCAs and I-129 petitions
stating that the beneficiaries would work for nonexistent projects at the Danville location, to
obscure the true nature of their scheme from government adjudicators, to falsify documents to be
included in H-1B applications or in responses to RFEs, and to pressure the beneficiaries to sign
fraudulent offer letters and take "voluntary" leave before starting work. The evidence at trial
also showed that the EcomNets employees, including Narang, performed this work in a
coordinated and collaborative manner, often with many employees in the same room at the same
time. And they did so despite the common knowledge that the documents they were submitting
to the government contained significant misrepresentations, including about the nature of
EcomNets and the other corporate entities under Kosuri's control, the individuals purporting to
act on behalf of those entities, and the nature and location of the work the visa beneficiaries
would be performing. The well-coordinated nature of EcomNets's H-1B visa scheme, the
multiple conversations among EcomNets employees indicating awareness of the illegality or
impropriety of their activities, and the clear evidence demonstrating that the various types of
fraud were matters of common knowledge within the enterprise place the existence of a
conspiracy beyond question.

Defendant does not squarely dispute that Kosuri and his associates were engaged in a complex H-1B visa scheme involving fake names, shell corporations, and misrepresentations about work opportunities at the Danville site. Indeed, defendant effectively concedes that many of the documents submitted to the government as part of the scheme were "not accurate." Bench Trial Tr. 306. Nor does defendant claim she did not play a role in that scheme. Instead, she argues that although the misrepresentations were "distasteful," they did not amount to criminal or otherwise unlawful activity in light of the complex nature of immigration law. See id. at 306-07. As detailed below, defendant's arguments are unsuccessful.

As relevant here, § 1546(a) applies to anyone who

> knowingly makes under oath, or as permitted under penalty of perjury . . . knowingly subscribes as true, any false statement with respect to a material fact in any application, affidavit, or other document required by the immigration laws or regulations prescribed thereunder, or knowingly presents any such application, affidavit, or other document which contains any such false statement or which fails to contain any reasonable basis in law or fact.

18 U.S.C. § 1546(a). As summarized by another judge of this district, to satisfy § 1546(a), the government must prove beyond a reasonable doubt

> (1) that defendants made a false statement in an immigration document, (2) that the false statement was made knowingly, (3) that the false statement was material to [immigration authorities'] activities or decisions, (4) that the false statement was made under oath, and (5) that the false statement was made in an application required by the immigration laws or regulations of the United States.

United States v. O'Connor, 158 F. Supp. 2d 697, 720 (E.D. Va. 2001).

Narang first takes issue with the government's argument that the EcomNets submissions were false because they misrepresented the present availability of positions to be filled by foreign skilled workers. Defendant recognizes that "[t]he H-1B program was not intended to provide an avenue for nonimmigrants to enter the U.S. and await work at the employer's choice or convenience" and that the program's true "purpose is to enable employers to employ fully-

qualified workers <u>for whom employment opportunities currently exist</u>." Labor Condition

Applications and Requirements for Employers Using Nonimmigrants on H-1B Visas in Specialty

Occupations and as Fashion Models, 59 Fed. Reg. 65,646, 65,656 (Dec. 20, 1994) (included as

DEX 1) (emphasis added).  Nonetheless, Narang argues that the H-1B application process

requires nothing more than that "a vacancy [be] reasonably likely in the future."  Mot. to Dismiss

Indictment [Dkt. No. 317] ("Mot. to Dismiss") 4; <u>see also</u> Bench Trial Tr. 252 (Khanna opining

that the applicable regulations "seem[] to say" that an H-1B petitioner need only state "a

reasonable good faith likelihood of employment in at least six months' time").  This argument

fails for two reasons.  First, even if nothing in the statutes or regulations governing the LCA and

H-1B petition processes expressly precludes an application based on a reasonably anticipated

rather than a current job opening,[17] a petitioner seeking an H-1B visa from the government must

tell the truth, which means it must disclose to the government that the petition is based on an

anticipatory rather than a current need.  Such a disclosure in this case, of course, would likely

have triggered increased scrutiny on behalf of the government adjudicators—scrutiny which

Kosuri and his coconspirators were desperate to avoid.  So it is unsurprising that the H-1B

applications prepared as part of Kosuri's scheme do not contain any accurate description of the

"prospective" nature of the beneficiaries' employment.  Second, the notion that anyone at

EcomNets had a "reasonable good faith" basis to believe that each H-1B beneficiary would have

a job by the time his or her application was approved is wholly inconsistent with the evidence.

Narang and her associates did not even start looking to place H-1B beneficiaries with other

companies until their visa applications were approved.  Often, it would take weeks or even

---

[17] In this respect, it is worth observing that Khanna's own article from 2009 states that USCIS's
purpose in administering the H-1B program is ensuring that every beneficiary "is or will be
working in a position whose existence is beyond doubt."  <u>See</u> Bench Trial Tr. 276.

months to find a position for a beneficiary, which is why EcomNets routinely asked its beneficiaries to sign voluntary leave requests to avoid having to pay them until a position had been found. The EcomNets conspirators had every reason to know that most, if not all, of their visa beneficiaries would not step into an available position once their petitions were approved, a fact which defeats defendant's argument about a good-faith-basis exception.

Narang also argues that there was nothing illegal or fraudulent about listing the visa beneficiaries' work location as Danville, Virginia. Narang does not squarely dispute Kosuri's and Kaur's testimony that it was common knowledge that there were no open jobs or projects at the Danville facility; instead, she argues "that geographic specificity as to a prospective job is aspirational as opposed to binding." Mot. to Dismiss 5; see also Bench Trial Tr. 253-56 (attempting to develop this argument during the direct examination of attorney Khanna). Again, Narang's argument is meritless. The form every prospective employer must complete for purposes of submitting an LCA makes clear that "[i]t is important for the employer to define the place of intended employment with as much geographic specificity as possible." DEX 3, at 3. The form goes further in its efforts to demand geographic precision, requiring that the addresses provided be physical locations rather than P.O. boxes. See id. To the extent Narang's view is that this address requirement does not require absolute certainty, she is in some sense correct. The exact work site may change between the time an employer files an LCA and the date the H-1B visa is approved. In that case, the petitioner may inform the government of the change without submitting a new LCA so long as the new site is within the same geographical region as that identified in the original LCA. (If the new work site is outside that geographical region—as was often the case for EcomNets's beneficiaries, who were seeking work across the country—a new LCA must be prepared.) But whatever the merits of that argument, it falls apart when

assessed against the actual facts of this case. Because there never were available jobs or projects at the Danville facility, and because there was no possibility that any jobs or projects would come available in the interim between application and approval, it simply cannot be said that anyone at EcomNets was making a "best good faith guess" in stating that the beneficiaries would work in Danville, see Bench Trial Tr. 253 (Khanna). To the contrary, Kosuri and his coconspirators were affirmatively misleading the government with full knowledge that the beneficiaries would, once placed, be spread throughout the country. When pressed during cross-examination, even defendant's expert Khanna admitted that such a scheme was inconsistent with the applicable rules and regulations:

> Q. In your opinion as an expert immigration lawyer, you think it's okay to tell USCIS that a prospective H-1B beneficiary would be doing a particular job for a company in a particular location when you know that there is no intention of placing the beneficiary in that job in that location?
>
> A. It is not okay, no, sir.

Bench Trial Tr. 285.[18] This is exactly the type of misrepresentation which the visa fraud statute is intended to capture.

The same is true for defendant's quibbling with the government's argument that EcomNets improperly forced its visa beneficiaries to sign voluntary leave requests to avoid having to pay for nonproductive time. See, e.g., Bench Trial Tr. 196-97 (Chopra describing how she was asked to take three months' "voluntary" leave even though she was ready to begin work). The "voluntary" leave requests formed an important part of the EcomNets scheme; otherwise, the company would have had to pay the visa beneficiaries while their job search was

---

[18] Khanna also admitted that "it would be wrong to submit false contractor agreement documents" or "false purchase orders to USCIS in support of visa applications." Bench Trial Tr. 283-84. The evidence shows that the EcomNets conspirators did both. See, e.g., GEX 101, at 22261-65.

ongoing and while no money was coming into EcomNets from the third-party companies. See 20 C.F.R. § 655.731(c)(6) (providing that an H-1B visa beneficiary should be paid "beginning on the date when [she] 'enters into employment' with the employer," meaning when she first makes herself "available for work or otherwise comes under the control of the employer"). Narang attempts to avoid this clear regulatory requirement, arguing that H-1B employers "are perfectly free to strike a bargain" in which the visa beneficiary agrees to request voluntary leave rather than being terminated without cause. Mot. to Dismiss 6. This bizarre argument misses the point altogether. Even assuming a genuine employer who otherwise would have to terminate an H-1B beneficiary could make such an offer, cf. id. at 6-7 (positing that an employer might be faced with such a circumstance "where a beneficiary's American colleagues were not being paid for nonproductive time"), that does not mean a company with no genuine positions to offer can mislead the government, secure an H-1B visa, and then hold the beneficiary hostage while attempting to find her work. Narang's tortured construction of the regulations is contrary to their text and spirit and does not negate the finding of a conspiracy to commit visa fraud.

Next, defendant submits that none of the foregoing misrepresentations could have been material as required by § 1546(a). Specifically, she argues that the immigration adjudicators assessing H-1B applications care only about an employer's right to control the potential visa beneficiary and that none of the misrepresentations speak to that right to control. Defendant is wrong on both counts. Although a valid employer–employee relationship, which under federal common-law principles depends on several factors including "the right to control the manner and means by which" the employee's work is performed, see DEX 9, at 3 (quoting Nationwide Mut. Ins. Co. v. Darden, 503 U.S. 318, 323 (1992)), is certainly relevant to USCIS adjudicators, it is not the only relevant consideration. As both Violett and Khanna explained at trial, adjudicators

care not only about the existence of a valid employment relationship but also about the specific characteristics of that relationship, including what types of work the visa beneficiary will perform, for whom, and in what location. Moreover, even if a valid employment relationship were the only concern of USCIS adjudicators, the conspirators' fraudulent statements would remain material. Khanna, Narang's only witness, recognized that the "location of the work" is a relevant factor to be considered in deciding whether an employer has a right to control the visa beneficiary. See Bench Trial Tr. 262 (Khanna direct examination: "Q. Does the employer–employee relationship turn on the location of the beneficiary relative to the petitioner? A. Directly, no, but if somebody is working off premises, then USCIS may look at the relationship more carefully or more minutely."); see also id. at 275 (pointing to GEX 110, at 2042, which contains a nonexhaustive list of fifteen factors to be considered in assessing the right to control, one of which is the "location of the work"). Likewise, Narang cannot credibly argue that a USCIS adjudicator with all relevant facts could not have concluded that EcomNets lacked a sufficient right to control the beneficiaries for which it secured H-1B visas. As Narang herself recognizes, "the right to control . . . is subject to interpretation," Mot. to Dismiss 3, and it is at least doubtful whether the EcomNets personnel were "responsible for" the visa beneficiaries in any meaningful sense, see Bench Trial Tr. 246.

For similar reasons, defendant is incorrect in arguing that there is nothing material about the conspirators' use of shell corporations or their placement of fake names and false signatures on documents submitted to the USCIS. In one sense, this conclusion is a matter of common sense: As the Court put it during a midtrial ruling, "if the document is signed with the name of a fake person, it's fraudulent." Bench Trial Tr. 39. Yet it also flows from evidence at trial concerning what types of evidence would have been most concerning to H-1B visa adjudicators.

As Violett credibly explained during his testimony, adjudicators look for any indications of fraud or material omissions; for evidence confirming a bona fide employment opportunity in a specialty occupation; and for affirmation that the employer identified in the H-1B visa petition will exercise an appropriate level of control over the work of the visa beneficiary. Had USCIS known about Kosuri's creation of four shell corporations that were in fact "all part of EcomNets," Bench Trial Tr. 58, the conspirators' use of the fake names Sam Bose and Sonia Basu, or their creation of false leases and other documents, all of which was designed to hide the fact that EcomNets had no jobs for any of the potential H-1B visa beneficiaries, USCIS would have conducted additional investigations and ultimately would have denied the H-1B applications. These representations and documents were, therefore, unquestionably material and thus fall within the scope of § 1546(a).[19]

Finally, defendant argues that EcomNets's collaboration with immigration attorneys negates any agreement to commit a criminal offense, reasoning that Kosuri and his associates could not have reached such an agreement if they believed, based on the advice of counsel, that what they were doing was lawful. "The general rule is that advice of counsel is no excuse for violation of law." Miller v. United States, 277 F. 721, 726 (4th Cir. 1921). "But where the question . . . is one of intent, the advice and the good faith of the defendant is a defense." Id. To

---

[19] Khanna recognized, albeit reluctantly, the problematic nature of using fake names on H-1B visa applications and associated documents. When asked whether it was appropriate to sign with a fake name on a document to be submitted on behalf of a petitioning corporation, Khanna responded that he "wouldn't do it." Bench Trial Tr. 270; accord id. at 276. Later, when asked whether he had taught Narang during her tenure with his immigration firm to submit documents containing false names, Khanna relied, "No, sir, I hope not." Id. at 283. He made a similar statement with respect to the conspirators' strategic use of fake lease agreements with several of Kosuri's "shell" companies, stating that there was something "not right" about their conduct and that "as an immigration lawyer, [he] would probably decline to represent th[ose] companies." Id. at 288-89.

negate the requisite showing of mens rea and thereby avoid criminal liability, a defendant invoking the advice-of-counsel defense must demonstrate "(a) a full disclosure of all pertinent facts to an expert . . . and (b) good faith reliance on the expert's advice." United States v. Butler, 211 F.3d 826, 833 (4th Cir. 2000) (quoting United States v. Miller, 658 F.2d 235, 237 (4th Cir. 1981)).

Defendant has not satisfied that affirmative burden here. No attorney testified to leading Kosuri and the coconspirators into this scheme with bad legal advice. Although defendant elicited testimony that EcomNets hired several lawyers to assist in preparing and submitting documents related to H-1B visa applications, there was absolutely no testimony with respect to what, if any, facts about the scheme were communicated to counsel. See, e.g., Bench Trial Tr. 236 ("THE COURT: . . . [W]e do not have the attorneys here to say what information they were told which led them to give the answers that they did. I don't know any attorney who would be comfortable sending a document through if [he] knew that the signature on the document were false. So the fact that the lawyer might have said, well, it's all right to indicate that employment is going to be in Danville doesn't mean a thing if we don't know what the lawyer was told."). Although the Court pointed out that deficiency before defendant's case in chief, defendant did not seek to call any of the attorneys who she claimed had provided legal advice to Kosuri or other members of the conspiracy. Further, the evidence at trial established that the key EcomNets employees, including Kosuri and Narang, knew they were violating the rules and regulations related to obtaining H-1B visas, which undercuts any argument of good-faith reliance on the advice of counsel and defeats Narang's advice-of-counsel defense.

In sum, defendants' many efforts to show that there was nothing illegal or fraudulent about the EcomNets scheme are unavailing,[20] and the government has proved the existence of a conspiracy to commit visa fraud beyond a reasonable doubt.

## 2. Narang's Willing Participation

To prove that Narang violated § 371, the government must also show her knowing and willing participation in the conspiracy. Tucker, 376 F.3d at 238. A defendant "need not know every member of a conspiracy or act at every stage in order to be liable for the conspiracy as whole." United States v. McCoy, 895 F.3d 358, 364 (4th Cir. 2018); see also United States v. Banks, 10 F.3d 1044, 1054 (4th Cir. 1993) ("[O]ne may be a member of a conspiracy without knowing its full scope, or all its members, and without taking part in the full range of its activities or over the whole period of its existence."). Even if defendant "played only a minor part," she may be convicted so long as she "join[ed] the conspiracy with an understanding of [its] unlawful nature and willfully join[ed] in the plan on one occasion." United States v. Roberts, 881 F.2d 95, 101 (4th Cir. 1989).

The government proved beyond a reasonable doubt that Narang willingly participated in the EcomNets conspiracy with full knowledge of its unlawful nature. In fact, Narang played a critical role in that conspiracy. Without her involvement, all of EcomNets's H-1B visa beneficiaries would have had to be paid as soon as they were "available" to work, 20 C.F.R. § 655.731(c)(6), which would have either destroyed the company's profit model (if it had paid) or rendered it vulnerable to beneficiary complaints and government investigations (if it had not).

---

[20] Similarly unconvincing is defendant's last-ditch argument that "the beneficiaries aren't complaining." See Bench Trial Tr. 306. For one thing, there is no "no harm, no foul" exception to visa fraud liability. For another, that many of the beneficiaries had to wait months before being paid and were pressured into various forms of fraud by Kosuri and his associates severely undercuts any notion that the EcomNets scheme was harmless.

By acting as the agent primarily responsible for placing many of the "bench" beneficiaries with other companies, Narang was fully aware of the fake Danville positions and the need to find bona fide jobs elsewhere. The evidence established that she had regular interactions with beneficiaries all around the country, many if not most of whom had no intentions of working anywhere in Virginia, let alone at a nonexistent project at the Danville site. Narang was a key member of the conspiracy, a fact reflected in the number of emails on which she was copied and documents in the record that she signed. Although Kosuri's businesses had obtained a "few" H-1B visas before Narang was hired, see Bench Trial Tr. 68, Narang's participation allowed the scheme to flourish. In 2014 and 2015, after Narang started working for Kosuri, his "staffing" companies succeeded in having 121 of their I-129 petitions selected for adjudication in the H-1B visa lottery, a figure which does not include the petitions they filed that were not selected in the first place. In sum, the high degree of Narang's involvement with the EcomNets scheme renders implausible any claim that she did not know what Kosuri's companies were doing.

Extensive witness testimony and documentary evidence confirm that Narang was well aware of the unlawful nature of the scheme. For example, Kaur, who worked in a lower-level HR capacity in the office directly next to Narang's, provided valuable insight into how the visa fraud taking place within Kosuri's enterprise was an open secret. Kaur testified that there were no jobs available for H-1B visa beneficiaries with EcomNets when their visas were approved and that finding those beneficiaries work and convincing them to request "voluntary" leave in the meantime constituted the bulk of Narang's job. See Bench Trial Tr. 157-58. Kaur also explained that the H-1B petitions with which she and Narang were assisting, first on behalf of EcomNets and subsequently on behalf of Data Systems, falsely listed each beneficiary's worksite as Danville, Virginia, even though none of the beneficiaries would ever go to work there. See id. at 160-62

(Kaur direct examination: "Q. Was it known throughout the office that no workers were working in Danville, Virginia? A. Yes. Q. Would you describe that? A. I mean, everyone knew that no one is working in Danville because the employees[—]when they call, they're not calling from Danville. They're calling [from] all over the United States."). Kaur testified that she even announced to several EcomNets employees, including Narang, that although the H-1B petitions listed the work site as Danville, no beneficiaries would actually be working there, explaining that Narang heard the statement but did not respond. Bench Trial Tr. 161-62. Another way in which the H-1B petitions were fraudulent was the use of fake names Sam Bose and Sonia Basu to deflect unwanted attention from USCIS investigators. Kaur not only knew that Bhattacharya was signing key documents as "Sam Bose"; Kaur actually alerted Narang to the use of fake names, stressing the obvious point that documents submitted to immigration authorities "shouldn't" be falsified. See id. at 163-64. Kaur testified that Narang's only response was to smile knowingly. See id. at 164. Although Kaur testified pursuant to an immunity agreement, the Court finds that her testimony was forthright and credible and supports the finding that Narang was fully aware of the unlawful nature of EcomNets's scheme.

Kaur's testimony was corroborated not only by Kosuri's testimony describing Narang's participation in the scheme and the "common knowledge" among the coconspirators that Bhattacharya was using fake names on documents submitted during the H-1B visa application process, see Bench Trial Tr. 81,[21] but also by numerous documents in the record. For example,

---

[21] Defendant highlighted two possible reasons to discount Kosuri's testimony: that the government had agreed not to seek jail time for Kosuri's wife, who was also charged in the conspiracy, and that Kosuri had lied during his initial encounter with government investigators. See Bench Trial Tr. 134-42. Neither factor undercuts the Court's finding that Kosuri was credible. His testimony was well corroborated by other witnesses and the documentary evidence.

in an email to a potential H-1B visa beneficiary, Narang readily responded to most of the

beneficiary's questions but declined to answer in writing when asked what would happen if the

beneficiary was "on bench for a duration," insisting that the beneficiary call her to discuss that

issue. GEX 35, at 942515; cf. Bench Trial Tr. 105 (Kosuri reasoning that Narang asked the

beneficiary to call because she did not want to state in an email that EcomNets "do[es not] pay

people on bench"). In response to an RFE, Narang helped to prepare false lease documents

designed to give government adjudicators the impression that EcomNets and Kosuri's "staffing"

companies were genuine independent businesses. On one occasion, Narang sent one of

EcomNets's attorneys a lease document with inconsistencies as to the relevant corporate entity,

GEX 130, at 22340 (containing an office lease listing United Software as the lessee but listing

EcomNets on the bottom of each page), and in response the attorney pointed out Narang's

mistake and warned her to "be careful," GEX 50, at 86840, clearly indicating that there would be

consequences if the government discovered the nature of the fraud. Narang took that advice to

heart, warning employees working under her not to "interchange any information[, e]specially

the names of the signing authorities, addresses and [federal employer identification numbers]."

GEX 21, at 232449. With respect to the conspirators' use of false names, Narang on several

occasions sent Bhattacharya documents with blank signature lines to be signed by "Sam Bose"

and instructed Bhattacharya to "do the needful," which Kaur explained meant that Bhattacharya

would apply the signature of this fake person. See, e.g., GEX 51 (Narang forwarding

Bhattacharya a letter to be signed by Sam Bose); GEX 51A (the letter Bhattacharya attached in

response, which contains the "Sam Bose" signature); see also Bench Trial Tr. 181 (Kaur

referring to an email she sent to Bhattacharya, see GEX 69, in which Kaur asked Bhattacharya to

"do the needful" with respect to signing another document with the "Sam Bose" signature).

Narang made clear that she knew Bhattacharya was forging signatures by sending Kosuri an email attaching documents with blank signatures for Sam Bose and informing Kosuri that they needed to "get the last page . . . signed from [Bhattacharya]." GEX 18, at 949354, 949361. In one instance, Narang forwarded Kosuri an email she was "planning to send" after a discussion with one of EcomNets's attorneys; the message to be sent was on behalf of United Software and was to be signed by Sam Bose. See GEX 52.[22] Taken together, the documentary evidence indicating Narang's awareness that EcomNets personnel were placing fictional names on documents submitted to the USCIS, falsifying other documents, and using shell corporations to create the appearance of bona fide employment opportunities at the Danville site corroborates Kosuri's and Kaur's accounts that many components of the visa fraud scheme were common knowledge within EcomNets and certainly would have been well known to Narang.

Furthermore, Narang's position and duties within the EcomNets scheme were themselves fundamentally inconsistent with any argument that she did not knowingly and willingly participate in the conspiracy. Narang spent most of her time trying put H-1B visa beneficiaries to work anywhere but at the Danville facility. As even Khanna recognized, it is not appropriate "to tell USCIS that a prospective H-1B beneficiary would be doing a particular job for a company in a particular location when [it is] know[n] that there is no intention of placing the beneficiary in that job in that location." Bench Trial Tr. 285.

---

[22] Defendant points out that this email "had nothing to do with the government" but rather involved a dispute between Kosuri's enterprise and New England IT Associates ("NEIT"), one of the third-party companies with whom an H-1B visa beneficiary had been placed. See Bench Trial Tr. 139. Defendant's argument mischaracterizes the import of this evidence, which goes to Narang's awareness that Sam Bose was a fictious person, that United Software was a shell corporation with no true business of its own, and that both were frequently used in the course of the EcomNets enterprise. Likewise, that Narang ultimately sent NEIT the email under her own name rather than Bose's, see id. at 140-41, is irrelevant to the question whether Narang willingly and knowingly participated in the visa fraud conspiracy.

Narang's final argument once again invokes the advice-of-counsel defense, this time arguing that even assuming the existence of a conspiracy to commit visa fraud, she did not knowingly and voluntarily take part in that conspiracy because she was acting on the advice of counsel. This argument is meritless.[23] To be sure, several attorneys had been hired by EcomNets and were involved in submitting many of the documents to the DOL and the USCIS. For example, Kosuri explained that attorneys prepared the I-129 petitions based on documents obtained from EcomNets's human resources department; compiled and submitted responses to RFEs, again based on information and documents received from EcomNets staff; and even occasionally forged signatures on documents. See, e.g., Bench Trial Tr. 54-55, 61. Defendant also elicited testimony from Kosuri indicating that those attorneys had blessed some of the aspects of the H-1B visa scheme. See, e.g., id. at 134 (Kosuri admitting that his attorneys "advised [him] that it was okay to require beneficiaries to sign voluntary leave statements" and "to list Danville as the place of employment").[24] Yet that alleged advice did not cover all aspects of the scheme, including the use of fake names to deflect unwanted attention from government investigators. Further, there was no evidence indicating what exactly Kosuri, Narang, or anyone else at EcomNets may have told those attorneys about the underlying scheme. Without those key facts, defendant cannot establish the "full disclosure of all pertinent facts" required to invoke the

---

[23] Although the burden of proving Narang's willing participation in the conspiracy remains on the prosecution, "[i]t is constitutionally permissible to place on . . . defendant the burden of producing some evidence to establish an affirmative defense." O'Connor, 158 F. Supp. 2d at 728 n.55. The Court finds that defendant has not pointed to sufficient evidence to establish a prima facie advice-of-counsel defense so as to shift the burden back to the government to prove "that the affirmative defense has not been established," id.

[24] The latter admission is of questionable value, as Kosuri attempted to provide a clarification but was cut off by defendant's counsel. See Bench Trial Tr. 134 ("Q. And [your attorneys] told you that it was okay to list Danville as the place of employment? A. Yes, but they have advised— Q. Yes is all we need.").

advice-of-counsel defense. Cf. id. at 264 (The Court: "[T]he attorney['s] representations are only as good as the information given to him."). Nor did defendant present any evidence indicating what, if anything, the attorneys told Narang about her actions within the scheme. The best defendant can do is to point to Kosuri's testimony that he had "passed th[e attorneys'] advice on to [his] employees," including Narang. See id. at 135. That vague statement does not provide any of the specific facts needed to make out the affirmative defense, see, e.g., O'Connor, 158 F. Supp. 2d at 728 (requiring, among other things, that the defendant produce evidence that he made a "full and accurate report . . . to the professional of all material facts" and "acted strictly in accordance with th[at] advice")—and does nothing to show that any reliance on Kosuri's statements by Narang would have been in good faith. What is more, defendant's argument is foreclosed by Fourth Circuit precedent holding that an intermediary's alleged "convey[ance]" of an attorney's advice to a criminal defendant "does not satisfy the elements of a reliance defense." See United States v. Bostian, 59 F.3d 474, 480 (4th Cir. 1995). At bottom, the evidence suggests only that the attorneys working for EcomNets were either unaware of the true nature of the fraudulent scheme or else actively participated in that scheme alongside the other conspirators and as such does not preclude a finding that Narang knowingly and willfully participated in the conspiracy. Accordingly, the government has satisfied its burden of proof with respect to this second element.

### 3. Overt Acts[25]

Finally, the government must prove that at least one of the conspirators committed at least one of the overt acts charged in the indictment. An overt act is "some type of outward

---

[25] On the first day of trial, Narang moved to exclude any evidence of overt acts not explicitly mentioned in the indictment, arguing that allowing the government to introduce evidence of other acts "would result in an impermissible constructive amendment" of the indictment. Mot. to Exclude Evidence [Dkt. No. 314] 1. As the government pointed out, "[i]t is well established that

objective action performed by one of the members of the conspiracy which evidences that conspiracy." O'Connor, 158 F. Supp. 2d at 723 n.49 (citation omitted). "[T]he government need only show that any one of the co-conspirators took an overt act with the purpose of furthering the conspiracy"; it need not show that each coconspirator took such an act. United States v. Robinson, 908 F. Supp. 2d 753, 761 (W.D. Va. 2012) (citing United States v. Cardwell, 433 F.3d 378, 391 (4th Cir. 2005)).

That burden is easily satisfied here. Count 1 of the indictment alleged 22 overt acts taken by various members of the conspiracy. Overt act (p) alleged that Narang "signed a Consultant Verification Letter falsely representing that Data Systems . . . had contracted with EcomNets . . . to provide technical services for its ongoing project Enterprise Cloud Implementation project, and that [a visa beneficiary named Chandra Bhan ("Bhan")] would be working in Danville, Virginia as a Computer Systems Analyst." Indictment [Dkt. No. 1] ¶ 21(p), at 10. The government proved beyond a reasonable doubt that Narang created and signed that letter, which was provided to the USCIS in response to an RFE triggered by the H-1B visa application filed on Bhan's behalf. See GEX 110, at 22264-65 (signed by Narang on behalf of EcomNets and containing many false statements, including that Data Systems had contracted with EcomNets;

---

when seeking to prove a conspiracy, the government is permitted to present evidence of acts committed in furtherance of the conspiracy even though they are not all specifically described in the indictment." Bench Trial Tr. 10 (quoting United States v. Bajoghli, 785 F.3d 957, 963 (4th Cir. 2015)). The case law Narang cited in response is not to the contrary. Although an indictment that specifically identifies the manner in which a substantive offense was committed cannot be constructively amended so as to "broaden[] the possible bases for conviction from that which appeared in the indictment," United States v. Milstein, 401 F.3d 53, 65 (2d Cir. 2005) (alteration in original) (citation omitted), "[t]here is no constructive amendment 'where a generally framed indictment encompasses the specific legal theory or evidence used at trial," id. (citation omitted). In light of the clear line of precedent allowing the presentation of evidence related to overt acts not specifically mentioned in the indictment, the Court denied Narang's motion to exclude. See Bench Trial Tr. 10.

that an "Enterprise Cloud Implementation" project was underway at the Danville facility; and that Bhan would be employed as a computer systems analyst for that project). In addition, overt act (r) alleged that Narang signed a consultant verification letter, again in response to an RFE, this time certifying that Sundaram, another EcomNets beneficiary, would be working as a computer systems analyst at Danville under a contract between United Tech and EcomNets for the provision of technical services for the "Federal Cloud Solutions" project. Indictment [Dkt. No. 1] ¶ 21(r), at 11. Here, too, the government proved the commission of this overt act beyond a reasonable doubt; that letter was signed by Narang and submitted as part of the H-1B application process on Sundaram's behalf. See GEX 110, at 2077-78.

Accordingly, the government has carried its burden with respect to the last of the necessary elements for a § 371 offense, and for all the reasons discussed above the Court will find defendant guilty of conspiracy to commit visa fraud.

### B. Visa Fraud

Counts 6 and 7 charge Narang with substantive visa fraud in violation of 18 U.S.C. § 1546(a). Specifically, Count 6 is based on an H-1B visa obtained for Bhan, and Count 7 is based on an H-1B visa obtained for Sundaram.

In urging acquittal on both substantive counts, Narang focuses only on the "specific instances of communicating with the Government attributed to [her]" in the indictment. See, e.g., Mot. to Dismiss 7. She argues that she cannot be subject to liability under § 1546(a) because the false contract documents and consultant verification letters bearing her signature that were submitted as part of the H-1B applications did not themselves contain any statement that they had been signed under penalty of perjury. Whether an individual who makes a false statement on a document without express penalty-of-perjury language can be held directly liable for visa fraud if the document is submitted in support of an I-129 petition that does contain such

language is an open question in this circuit and has divided other courts of appeals. Compare United States v. Khalje, 658 F.2d 90, 91-92 (2d Cir. 1981) (interpreting § 1546(a) to criminalize not only swearing to a material false statement in the visa application itself but also "present[ing] materially false statements in such applications, whether or not" under penalty of perjury), with United States v. Ashurov, 726 F.3d 395, 397-402 (2d Cir. 2013) (holding that § 1546(a)'s criminalization of the "knowing[]" presentment of "any such false statement" applies only to statements made under oath or penalty of perjury). Yet as the government correctly points out, it is not necessary for the Court to resolve that conflict in this case.

To be sure, one way for the government to prove visa fraud is by proving beyond a reasonable doubt that Narang herself made fraudulent representations under penalty of perjury in violation of § 1546(a). But that is not the only basis upon which criminal liability may be established. Under the Pinkerton doctrine, "a defendant is 'liable for substantive offenses committed by a co-conspirator when their commission is reasonably foreseeable and in furtherance of the conspiracy.'" See United States v. Blackman, 746 F.3d 137, 141 (4th Cir. 2014) (quoting United States v. Dinkins, 691 F.3d 358, 384 (4th Cir. 2012)). Further, anyone who "aids, abets, counsels, commands, induces," "procures," or "willfully causes" another to commit a crime "is punishable as a principal." 18 U.S.C. § 2. These theories of liability are implicit in every substantive offense and need not be separately alleged in the indictment. See United States v. Ashley, 606 F.3d 135, 142-43 (4th Cir. 2010) ("[A]n indictment need not set forth vicarious coconspirator liability . . . ."); United States v. Rashwan, 328 F.3d 160, 165 (4th Cir. 2003) ("[C]onviction on an aiding and abetting theory is proper, even if the government did not specifically charge [the defendant] under 18 U.S.C. § 2."). Accordingly, in deciding whether Narang is guilty of the charges in Counts 6 and 7, the Court has considered not only the evidence

36

of her direct acts, but also those acts of her coconspirators reasonably attributable to her under Pinkerton or § 2.

      1.   Petition on Behalf of Chandra Bhan (Count 6)

One of Kosuri's shell "staffing" corporations, Data Systems, filed an I-129 petition on Bhan's behalf in March 2014. Kaur prepared the petition with the assistance of attorney Mathew Chacko. The I-129 petition falsely averred that Bhan would be employed as a computer systems analyst at the "Green Technology Center" in Danville, Virginia. GEX 101, at 22176. Kaur, who worked closely with Narang, signed the I-129 petition containing this false statement under penalty of perjury. See id. at 22178. Similarly false was the LCA underlying the I-129 petition, which stated that Data Systems had a temporary need for a computer systems analyst who would be employed in Danville. See id. at 22185-87. Kaur made a similar certification under penalty of perjury with respect to the I-129 supplement attaching a "Support Letter" designed to establish that the Green Technology Center position qualified as a specialty occupation, see id. at 22179-80, despite her knowledge that there was no such center in Danville. For the reasons outlined above, those statements were not only false but also material to USCIS's adjudication of the visa applications: Without a qualifying position available at the time (or, arguendo, reasonably likely to be available by the time the application was fully processed), no visa would have been approved.

The Court has already found that Kaur and Narang were members of the same conspiracy. Accordingly, under Pinkerton, any substantive offense committed by Kaur is attributable to Narang so long as it was reasonably foreseeable to Narang and in furtherance of that conspiracy. Those conditions obtain here. Kaur's submission of the fraudulent I-129 petition on Bhan's behalf was designed to further the EcomNets scheme by securing another H-1B visa beneficiary from whom the company could earn a profit. Moreover, the petition was

certainly reasonably foreseeable to Narang; indeed, such H-1B visa applications were the entire

thrust of the conspiracy. Accordingly, under <u>Pinkerton</u>, Narang is liable for Kaur's fraudulent

and material submission of the H-1B visa application on behalf of Bhan.

The government also proved that Narang took deliberate, knowing action designed to aid

and abet Kaur's submission of the materially fraudulent H-1B visa application. One of the

documents submitted along with that application is a "contractor agreement" between EcomNets

and Data Systems, under which Data Systems agreed "to provide technical or other specialized

services as an independent contractor to" EcomNets for the Green Technology Center in

Danville, Virginia. GEX 110, at 22260. Kaur signed on behalf of Data Systems, and Narang

signed on behalf of EcomNets. <u>Id.</u> at 22262. Exhibit A to that agreement was a purchase order

in which Data Systems purported to "agree[] to provide the services of Chandra Bhan to

EcomNets" for the "Enterprise Cloud Implementation" project. <u>Id.</u> at 22263. Again, that

agreement was signed by Narang along with Kaur. Finally, Narang prepared and signed a

consultant verification letter in which she described, in detail, the work Bhan would be

performing as a computer systems analyst for the project at Danville. <u>Id.</u> at 22264-65. As the

evidence at trial established beyond a reasonable doubt, all of those representations were false:

There was no Enterprise Cloud Implementation project at Danville, no open position with

EcomNets that Bhan could fill, and no legitimate contract between Data Systems and EcomNets.

The evidence also established, again beyond a reasonable doubt, that Narang knew that those

statements were false but signed off on them to assist with her coconspirators' efforts to obtain

Bhan's H-1B visa. Without those documents, the USCIS adjudicators would not have been

confident that there was a genuine temporary specialized position to be filled, an H-1B visa

would not have been approved, and Narang would have had one fewer beneficiary on whose

behalf she could look for work and recover a commission. Indeed, without Narang's assistance, the misrepresentations Kaur made under penalty of perjury, especially that there was an open position at the Danville site, would have been laid bare by the government's request for additional information. In sum, Narang's willful and knowing assistance with her coconspirator's submission, which was made under penalty of perjury, of a materially false application for an H-1B visa renders her substantively liable for visa fraud under the aiding-and-abetting principles codified in § 2(a), and consequently she will be found guilty of visa fraud as charged in Count 6.

### 2. Petition on Behalf of Guatami Sundaram (Count 7)

The same analysis applies to the H-1B application submitted on Sundaram's behalf, which was filed by United Tech, another of Kosuri's shell "staffing" companies, and signed by the nonexistent "Sonia Basu." See GEX 110, at 1987-88. That application stated, equally falsely, that Sundaram would be working as a computer systems analysist for the Green Technology Center in Danville. Id. at 1992. Bhattacharya or another of the EcomNets coconspirators signed the I-129 petition under penalty of perjury as "Sonia Basu," falsely certifying that the evidence contained in the petition was true and correct. See id. at 1994; see also Bench Trial Tr. 175 (Kaur direct examination: "Q. Is it fair to say a fake person was certifying as to the truthfulness of these documents? A. Yes."). "Sonia Basu" also certified the correctness and truthfulness of an I-129 supplement designed to establish that the nonexistent position in Danville qualified as a specialty occupation. GEX 110, at 1996-97. Narang and Bhattacharya, along with others working in concert with Kosuri, were members of the same conspiracy, and as a result Narang is substantively liable under Pinkerton for those material representations because they were reasonably foreseeable to her and made in furtherance of the visa fraud conspiracy.

Similarly, Narang directly contributed to her coconspirators' unlawful efforts to obtain an unwarranted H-1B visa on Sundaram's behalf. Narang prepared and signed a consultant verification letter from EcomNets purporting to verify that Sundaram would "provide technical services for [EcomNets's] on-going project Federal Cloud Solutions" in Danville as a computer systems analyst. See GEX 110, at 2077-78. She also signed a false contractor agreement and purchase order that described a "Federal Cloud Solutions" project taking place at Danville for which United Tech would provide skilled workers. See id. at 2079-82. Narang's signatures on behalf of EcomNets on both documents appear next to signatures for the nonexistent "Sonia Basu." Id. at 2081-82. Without these documents, there would have been no evidence of a genuine employment opportunity upon which the H-1B visa application could be based, and the application would not have been approved. Accordingly, Narang knowingly and willingly aided and abetted her coconspirators' submission, under penalty of perjury, of a materially false application for an H-1B visa, which under § 2(a) renders her equally guilty of the visa fraud charged in Count 7.

## IV. CONCLUSION

For the reasons stated above, defendant's motion to dismiss the indictment for insufficient evidence will be denied, and defendant will be found guilty on all three counts by an appropriate Order to be issued with this Memorandum Opinion.

Entered this 21st day of August, 2019.

Alexandria, Virginia

/s/ _____

Leonie M. Brinkema
United States District Judge

40